**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SUSAN L. WALTER, et al., | |
| Plaintiffs, | NO. 3:03-CV-1690 |
| v. | |
| PIKE COUNTY, PENNSYLVANIA, and the PIKE COUNTY DISTRICT ATTORNEY'S OFFICE, et al., | (JUDGE CAPUTO) |
| Defendants. | |

## <u>MEMORANDUM</u>

Presently before the Court are three motions for summary judgment.  (Docs. 56, 59-1, and 63-1.)  For the reasons set forth below, Defendants' motions will be granted in part and denied in part.  Defendants' motion for summary judgment as to Plaintiffs' substantive due process claim will be denied.  Defendants' motion for summary judgment as to Plaintiffs' procedural due process claim will be granted.  Defendants Westfall Township, Pike County, and the Pike County District Attorney's Office are entitled to assert the defense of municipal immunity and will be released as named defendants in this action.  Defendants DeSarro and Jacobs are not entitled to absolute immunity as to their investigative roles in the elicitation of a confession from Joseph Stacy.  Defendant Mitchell is not entitled to the defense of qualified immunity for any of his actions taken in this case.  Defendants DeSarro and Jacobs are entitled to assert the defense of qualified immunity as to their failure to warn the Walter family of the danger posed by Joseph Stacy in the period leading up to the murder of Michael Walter.  These Defendants are not entitled to the qualified immunity defense, however, for their involvement in the

elicitation of the confession from Joseph Stacy.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331[1] ("federal question jurisdiction" and 28 U.S.C. § 1367[2] ("supplemental jurisdiction" over related state-law claims).

## FACTUAL BACKGROUND

Michael Walter was shot and killed by Joseph Stacy in Port Jervis, New York on July 5, 2002.  (Doc. 6 ¶ 22.)  Mr. Stacy plead guilty to second degree murder on July 18, 2003.  Mr. Stacy had a prior criminal history.  Mr. Stacy served six years in prison for a 1961 manslaughter conviction for shooting his then girlfriend in October of 1960.  (Doc. 6 ¶ 26.)   In 1990, Mr. Stacy was convicted of simple assault for pointing a gun at a person, though this conviction was later reversed on appeal.  (Doc. 6 ¶¶ 29, 34.)

Mr. Walter and Mr. Stacy served together on the Westfall Township Planning Board.  (Doc. 6 ¶ 25.)   In August of 2001, three of the Walters' female children, ages six, nine, and thirteen, stayed at the Stacy residence while the Walters attended to family business out of state.  During their stay at the Stacy residence, the six year-old and the nine year-old were sexually and/or otherwise indecently assaulted by Mr. Stacy.  (Doc. 6 ¶¶ 40, 41.)

The girls told Mrs. Walter about the assault, who then informed the Westfall

---

[1] The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.  28 U.S.C.A. § 1331 (1980).

[2] [T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C.A. § 1367 (1990).

Township Police Department and the Pike County District Attorney's Office.  (Doc. 6 ¶ 42.)  Timothy Mitchell, then the Chief of Police for Westfall Township, responded to the Walter residence and assured them that he was extensively trained in handling child abuse cases and was capable of handling the instant matter.  (Doc. 6 ¶ 42, Doc. 64 ¶ 11)  Mr. Mitchell was also at that time a member of the Pike County Child Abuse Task Force.  (Doc. 57 ¶ 2.)  Also responding to the Plaintiffs' home was Bruce DeSarro, an Assistant District Attorney for Pike County.  The Plaintiffs' Amended Complaint alleges that Mr. Mitchell at this time assured the Walters that if criminal charges were pursued against Mr. Stacy, the Walters would be protected.  (Doc. 6 ¶ 43.)  Mrs. Walter's deposition testimony claims that Mr. Mitchell replied "yes" when queried whether the Walter family would be protected if they pursued criminal charges against Mr. Stacy.  (Walter Dep. 78:13, May 24, 2005.)  On the other hand, Mr. Mitchell expresses doubt, but apparently is not certain, that Mrs. Walter was even present during this exchange.  (Mitchell Dep. 86, October 14, 2004.)  Bruce DeSarro stated that Mrs. Walter was present for this discussion.  (DeSarro Dep. 72:5-6, February 23, 2005.)  In any case, Mr. Mitchell denies that any protection was ever offered to the Walter family.  (Mitchell Dep. 158-59.)  Mr. DeSarro testified that he did not recall any discussion of or agreement for protection to be provided to the Walters.  (DeSarro Dep. 93:13.)  The Walters allegedly decided to pursue criminal charges against Mr. Stacy based on an assurance of safety (Doc. 6 ¶ 44), but Defendants claim that the Walters understood the danger they might be placing themselves in and decided to pursue the charges regardless. (Doc. 57 ¶ 7, Doc. 64 ¶¶ 14, 16.)  Further, Mr. Mitchell contends that the Walter family later took actions evidencing–as perceived by Mr. Mitchell–the realization that they were not being

3

protected from Mr. Stacy, and were not entitled to such protection.  (Doc. 57 ¶¶ 20-22, 24.)  An example in support of this perception held by Mr. Mitchell was a letter sent by Mr. Walter to District Justice Charles Lieberman–dated August 21, 2001–in which he expressed his belief that Mr. Stacy was a risk to the Walter family and the community and that there existed "no guarantee of protection" from Mr. Stacy for his family while he was at work.  The letter, which requested that bail be denied to Mr. Stacy pending the prosecution of the assault charges, continues, "I feel this [that Mr. Stacy may have weapons and will use them] is a reasonable and foreseeable risk and you have time to prevent this danger" and is signed "With [u]rgency".  (Doc. 57, p. 16.)  Mr. Mitchell further supports this perception that the Walters did not believe they were entitled to protection by stating that the Walters took additional precautions such as not allowing their children to walk home from the bus stop and prohibiting their children from going on overnight trips.  (Doc. 57 ¶ 22; Walter Dep. 114-15.)

Plaintiffs, in their Amended Complaint, claim that Messrs. Mitchell and DeSarro, along with Douglas Jacobs, the District Attorney for Pike County, and William Tracy Todd, a detective/sheriff for Pike County, formulated a plan to get Mr. Stacy to admit that he sexually assaulted the Walter children.  The plan called for Mr. Walter to invite Mr. Stacy to the Walter home under false pretenses and then get Mr. Stacy to admit to the assault.  (Doc. 6 ¶¶ 46-48.)  Defendants, on the other hand, claim that the idea to lure Mr. Stacy to the Walter home in order to elicit a confession from him was the creation of Michael Walter.  (Doc. 57 ¶ 11.)  Mrs. Walter's deposition testimony states that Mr. Walter had conceived of the idea of inviting Mr. Stacy over to the Walter home–where he would be then arrested–in order to avoid a potential gun-battle at the Stacy home.  She

4

also testified, however, that Mr. Mitchell had to gain approval for the plan from the District Attorney's office, which he quickly was able to do.  (Walter Dep. 102.)

On August 16, 2001, Mr. Stacy went to the Walters' home and admitted to Mr. Walter–while the two were speaking outside of Mr. Mitchell's presence–that he had assaulted Mr. Walter's daughters.  (Doc. 6 ¶ 54.)  Mr. Stacy soon after made the same admission to Mr. Mitchell, who then arrested Mr. Stacy.  (Doc. 6 ¶¶ 55.)  Mr. Mitchell admitted that he did not search Mr. Stacy for weapons before allowing him to speak to Mr. Walter in private.  (Mitchell Dep. 122:15, October 14, 2004.)  Plaintiffs claim that it was part of the Defendants' alleged plan to have Mr. Walter speak to Mr. Stacy alone in order to elicit a confession.  (Doc. 6 ¶¶ 52, 54.)  However, Mr. Mitchell testified that he never intended for Mr. Walter to be involved in the interrogation of Mr. Stacy.  (Mitchell Dep. 120:13, 121-22, October 14, 2004.)

Immediately after Mr. Stacy was taken into custody on August 16, 2001, a search warrant was executed at the Stacy home.  (Doc. 6 ¶ 61.)  The search revealed twelve guns and hundreds of rounds of ammunition.  (Doc. 6 ¶ 62.)  Mr. Stacy's arrest was reported extensively in the local media.  (Doc. 6 ¶ 64.)  Mr. Stacy was shortly thereafter released on bail.

According to Mr. Mitchell, on the day he first spoke with Mr. Walter about the sexual assaults, August 14, 2001, Mr. Walter mentioned that Mr. Stacy had made statements in the past about 'picking off' [shooting] the [Planning Board of] Supervisors if they made an unfavorable vote [in an unrelated matter the two were involved in as members of the Planning Board].  (Mitchell Dep. 286:18, October 15, 2004.)  Mitchell's response to this comment was to request police protection for a number of subsequent

Planning Board meetings.  (Mitchell Dep. 288:11.)

In June of 2002, as his trial for the assaults was approaching, Mr. Stacy's behavior became increasingly threatening and was directed towards Messrs. Walter, Mitchell, and Jacobs.  The Amended Complaint states that the threatening conduct included stalking witnesses, inquiring as to home addresses, and being present on the Walters' street for no apparent reason.  (Doc. 6 ¶ 73.)  Mr. Mitchell testified that he believed Mr. Stacy was stalking him and had inquired about his home address.  (Mitchell Dep. 244:8, 219:21.) Scott Frazer, a local realtor, testified that Mr. Stacy had asked him for Mr. Mitchell's home address.  (Frazer Dep. 65:10, October 13, 2004.)  Plaintiffs contend that in response to these actions, the Pennsylvania State Police were asked to protect Mr. Mitchell, and Mr. Jacobs arranged for armed protection for himself, including at his private law practice. (Doc. 6 ¶ 77.)  Mr. Mitchell states that on Tuesday, July 2, 2002, one day after he witnessed Mr. Stacy stalking him outside of his office, he had arranged for approximately six to eight Pennsylvania State Police Troopers to be positioned outside of the building in case Mr. Stacy returned.  He further contends that one of these troopers was positioned in Mr. Jacob's law office on that day because there was a good line of sight to where Mr. Mitchell's vehicle was located.  (Mitchell Dep. 290.)  Mr. Mitchell stated that he did not believe that either Mr. Jacobs or Mr. DeSarro planned for personal security to protect themselves from Mr. Stacy, nor was any protection provided to them by the Township. (Mitchell Dep. 291.)  Mr. Mitchell further testified that additional security measures were taken at his police station, and that they were implemented in response to the threat posed by Mr. Stacy.  (Mitchell Dep. 291:9.)

Plaintiffs allege that because the situation was becoming increasingly hazardous,

Mr. Mitchell took leave from his job on or about Wednesday, July 3, 2002 and left the Pike County vicinity.  (Doc. 6 ¶ 81.)  Mr. Mitchell contends that he had a vacation already planned for that week, and decided to leave less than a day early for it.  (Mitchell Dep. 240:16.)  Because of the alleged stalking, Messrs. DeSarro and Mitchell attempted to have Mr. Stacy's bail revoked, but this request was denied by the magistrate judge.

On July 5, 2002, Mr, Stacy drove to Mr. Walter's place of employment at the Port Jervis Auto Mall in Port Jervis, New York, and shot him several times, fatally wounding Mr. Walter.  (Doc. 6 ¶¶ 85-87.)

**PROCEDURAL BACKGROUND**

On September 25, 2003, Plaintiffs filed a civil action complaint against named Defendants, alleging substantive and procedural due process violations under 42 U.S.C. § 1983 and wrongful death and survival actions under Pennsylvania state law.  (Doc. 1.) On October 30, 2003, Plaintiffs filed their First Amended Complaint, maintaining all of the counts against Defendants alleged in the original complaint.  (Doc. 6.)

Between October 17, 2003 and December 9, 2003, the various Defendants filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Docs. 11, 12, 17, 21, 26.)

On August 20, 2004, the Court issued an order granting in part and denying in part Defendants' motions to dismiss.  (Doc. 41.)  Most significantly, this order granted Defendants' motions to dismiss with respect to Count III of the Amended Complaint, which encompassed the Plaintiffs' claims for wrongful death and survival actions under Pennsylvania state law.  Also, the Court granted Defendants Pike County and Westfall

7

Township's motion to dismiss with respect to the assertion that punitive damages are not recoverable against municipalities and municipal agencies.  Additionally, the Court granted Defendant Westfall Township Police Department's motion to dismiss with respect to the assertion that dismissal of the Plaintiffs' § 1983 claim was proper.  Finally, the Court granted in part Defendants Douglas J. Jacobs and Bruce DeSarro's motion to dismiss with respect to the assertion that they were entitled to absolute immunity from suit for their decisions regarding re-arrest or revocation of bail of Mr. Stacy; and granted in part Defendant Pike County District Attorney's Office's motion to dismiss with respect to the assertion that it was not subject to liability under 42 U.S.C. § 1983 for its prosecutorial acts.  (Doc. 41, pp. 24-25.)

On July 15, 2005, Defendant Timothy Mitchell filed a motion for summary judgment.  (Doc. 56.)  On this same date, Defendants Pike County, Pennsylvania, Pike County District Attorney's Office, Douglas J. Jacobs, Bruce DeSarro, and William Tracy Todd filed a motion for summary judgment.  (Doc. 59-1.)  Also on this date, Defendants Westfall Township and Timothy Mitchell in his official capacity as a Westfall Township employee filed a motion for summary judgment.  (Doc. 63-1.)  All of the Defendants–accompanied with the aforesaid motions–filed Statements of Material Facts as to Which There are No Genuine Issues to be Tried.  (Docs. 57, 60, and 64, respectively.)  The parties later filed supplemental and reply briefs in support of their respective positions.  (Docs. 71, 72, 80, 85, 86, 87, 97, 100.)  It is the aforementioned three motions of July 15, 2005 that will be addressed herein.  These motions are fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *See id.* at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most

favorable to the nonmoving party. *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. at 249.

## DISCUSSION

The United States Supreme Court has said that only in very rare situations will a state's failure to protect someone amount to a constitutional violation, even if the state's conduct is grossly negligent. *Rivera v. Rhode Island*, 402 F.3d 27, 30 (1st Cir. 2005) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125). The Supreme Court has cautioned that "[t]he doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." *Id.* Based on the applicable record, the Court concludes that this case presents a unique factual scenario in which the state's failure to act in some fashion to protect–or at least warn–the Walter family may have established a constitutional violation.

Defendants have failed to satisfy their initial burden of proving that there is no

genuine issue of material fact as to any of the four requisite prongs of the state-created danger exception to the general rule that the government is not responsible for harm inflicted by third parties on individuals that are not in government custody.  Accordingly, Defendants' motions for summary judgment as to Count I of the Amended Complaint will be denied.

Defendants have, however, satisfied their burden of proving that there is no genuine issue of material fact as to the existence of a special relationship, under Pennsylvania law, between Michael Walter and the state actors in question, that would create a property right in police protection.  Accordingly, Defendants' motions for summary judgment as to Count II of the Amended Complaint will be granted.

Defendants Westfall Township, Pike County, and the Pike County District Attorney's Office are entitled to assert the defense of municipal immunity and will be released as named defendants in this action.  Defendants DeSarro and Jacobs are not entitled to absolute immunity as to their investigative roles in the elicitation of a confession from Joseph Stacy.  Defendant Mitchell is not entitled to the defense of qualified immunity for any of his actions taken in this case.  Defendants DeSarro and Jacobs are entitled to assert the defense of qualified immunity as to their failure to warn the Walter family of the danger posed by Joseph Stacy in the period leading up to the murder of Michael Walter.  Defendants DeSarro and Jacobs are not entitled to the qualified immunity defense, however, for their involvement in the elicitation of a confession from Joseph Stacy on August 16, 2001.

**Plaintiffs' Surviving Claims**

The plaintiffs have, *inter alia*, two major federal causes of action that have survived the order issued by this court, dated August 20, 2004, granting in part the Defendants' earlier motions to dismiss.  (Doc. 41.)  These are (1) a 42 U.S.C. § 1983 action for substantive due process violations; and (2) a 42 U.S.C. § 1983 action for procedural due process violations.  These actions will be discussed separately, each considered through the lens of the analysis applicable to motions for summary judgment.

**I. Substantive Due Process**

The Plaintiffs' first cause of action is based upon a violation of substantive due process.  Plaintiffs allege that Defendants acted under color of law and that their actions deprived Mr. Walter of his rights and privileges secured under the United States Constitution and by statute.  The Third Circuit Court of Appeals has recognized a "state-created danger" exception to the general rule that the government is not responsible for harm inflicted by third parties on individuals that are not in government custody.  This exception applies where "discrete, grossly reckless acts [are] committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury."  *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1153 (3d Cir. 1995).  The Third Circuit Court of Appeals has outlined four factors that must be met before the state-created danger exception applies:  (1) the harm ultimately caused was a foreseeable and fairly direct result of the state's actions[3]; (2) the state actor acted with a

---

[3] *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996).

degree of culpability that shocks the conscience[4]; (3) there existed some relationship

between the state and the plaintiff such that "the plaintiff was a foreseeable victim of the

defendant's acts," or a "member of a discrete class of persons subjected to the potential

harm brought about by the state's actions," as opposed to a member of the public in

general[5]; and (4) the state actor affirmatively used their authority in a way that created a

danger to the citizen or rendered the citizen more vulnerable to danger than had the state

not acted at all[6].  *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006).


*A.*      *Foreseeability of Harm and Harm Fairly Direct Result of State's Actions*

The first element of the state-created danger theory is that the harm ultimately

caused was a foreseeable and fairly direct result of the state's actions.  The moving

party–here, the Defendants–have not satisfied their burden at the summary judgment

stage of proving that there is no genuine issue of material fact as it relates to this prong

of the analysis.

Mr. Stacy's past violence, specifically, a manslaughter conviction, and his

tendency to possess a large assortment of firearms and ammunition were well know to

the Defendants.  Additionally, Defendants were aware of Mr. Stacy's earlier comments

about "picking off" members of the Planning Board of Supervisors (to which Defendant

---

[4] *County of Sacramento v. Lewis*, 523 U.S. 833 (1998); *Miller v. City of Philadelphia*, 174 F.3d 368, 375-76 (1999); *Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (2003).

[5] *Kneipp*, 95 F.3d at 1209, n.22; *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906, 913 (3d Cir. 1997).

[6] *See Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201; *Rivas v. City of Passaic*, 365 F.3d 181, 195 (3d Cir. 2004) (articulating the fourth element as requiring that "the state actor used his authority to create an opportunity for danger that otherwise would not have existed").

Mitchell's response was to request police protection for a number of subsequent Planning Board meetings).  Clearly then, Defendants were aware that Mr. Stacy posed a credible threat to the safety of others, including Plaintiffs.  However, these facts alone do not lead to the conclusion that the shooting death of Michael Walter on July 5, 2002, 323 days (10 months, 19 days) after his participation in eliciting the confession from Joseph Stacy, was a foreseeable and fairly direct result of the state's actions.

What does lend itself to a reasonable showing of foreseeability is a genuine dispute whether Defendants took additional measures to protect themselves from Mr. Stacy, while failing to even notify the Walters of Joseph Stacy's increasingly threatening behavior, in the period leading up to Stacy's trial.  Defendants cite *Martinez v. California*, 444 U.S. 277 (1980)[7], in arguing that because the murder happened nearly eleven months after the arrest, and that in the meantime Stacy took no threatening action towards the Walter family, that the murder was too remote in time and therefore not a foreseeable result of any conduct by Defendants.  The Court does not find the facts of *Martinez* to be congruous with the facts of the present action.  This case involves acts or omissions which made foreseeable the eventual harm to a discrete class of victims which included the Walter family.  Defendants also attempt to read a "proximate-timing" component into the use of the word 'remote' in the *Martinez* decision.  This Court's reading of *Martinez*, however, is that 'remote' is utilized therein to speak of an effect that

---

[7] *Martinez* stands for the propositions that a convicted sex-offender/parolee who killed a young girl five months after he was released was in no sense an agent of the parole board and that the girl's death was too remote a consequence of the parole officers' action in releasing him to hold them responsible for a due process violation.  The *Martinez* court makes a point of stating that the victim faced no special danger as opposed to the public at large.

is distant in relationship or connection, and was not intended to apply to a temporally-distant but causally-related effect of an earlier action.

Defendant Mitchell's brief (Doc. 85) also misconstrues the holding of *Green v. City of Philadelphia*, 2003 WL 1848731 (E.D. Pa. April 9, 2003).  Green's state-created danger claim failed on the fourth prong of the test, with the opinion holding that the officers did not "use their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur."  The *Green* opinion does not address the first prong of the state-created danger analysis.  *Id.* at *2.

The Court concludes that a reasonable fact-finder could find that Michael Walter's death was a 'fairly direct' result of the state's actions.  There exists a genuine issue for trial whether Defendants' actions in allowing Michael Walter to become involved in the confession of Joseph Stacy placed Mr. Walter "in the cross hairs," where he may not have been but for the state's actions.

Accordingly, the Court finds that Defendants have failed to satisfy their burden of proving that there is no genuine issue of material fact as it relates to this initial prong of the state-created danger analysis.


B.      *'Conscience-Shocking' Actions by the State Actor*

The second prong of the analysis asks whether the state actor acted with a degree of culpability that shocks the conscience.  Defendants have likewise failed to satisfy their burden of proving that there is no genuine issue of material fact as it relates to this second prong of the analysis.

"A constitutional violation may occur when the state acts in a way that makes a

15

person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention." *Schieber*, 320 F.3d at 416. However, to prove a violation of substantive due process, and therefore "generate liability, executive action must be so ill-conceived or malicious that it 'shocks the conscience.'" *Id*. at 417.  Under the 'shocks the conscience' standard, "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Miller*, 174 F.3d at 375.  Negligence, alone, is never enough to satisfy the standard; however, activity "at the other end of the culpability spectrum" is more likely to lead to liability, but liability may also arise from the mid-range of culpability measurement. *See id.*

Actions will be considered conscience-shocking if the state's activities are in willful disregard for or deliberate indifference to a plaintiff's safety.  *See Morse,* 132 F.3d at 910. "The state's actions must evince a willingness to ignore a foreseeable danger or risk." *Id.* The degree of wrongfulness required to reach the conscience-shocking level varies depending on the factual context. *See Estate of Smith v. Marasco* (*Smith*), 318 F.3d 497, 508 (3d Cir. 2003).

     i.     *Determining the appropriate culpability standard(s)*

The Third Circuit Court of Appeals has given guidance in determining whether particular conduct is conscience-shocking.   In a situation where forethought and the luxury of relaxed deliberations are possible, such as in the custodial situation of a prison, deliberate indifference to a prisoner's medical needs may be sufficiently shocking.  *Id.* On the other hand, when a government official is acting instantaneously in a

"hyperpressurized environment," a much higher fault standard–the intent to cause harm–is proper. *Id.* Then there exists the mid-level fault standard, delineated in *Miller*, which explains that where a split-second decision is not required but a decision must be made within a short period of time ("hours or minutes")[8], intent to harm is not required but the standard of culpability must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that "shocks the conscience." *Miller*, 174 F.3d at 375-76. The Court believes that the facts of the present case dictate that two separate culpability standards should be applied. The mid-range culpability standard is the most appropriate fit as to Timothy Mitchell's actions in eliciting a confession from Joseph Stacy on August 16, 2001. On the other hand, the 'deliberate indifference' standard is most appropriate when considering Defendants' failure to warn the Walter family of the threat imposed by Joseph Stacy in the period leading up to the murder of Michael Walter.

>    ii.    *Analysis of the appropriate culpability standards*

Timothy Mitchell was faced with a situation on August 16, 2001 in which he would not be able to achieve his directive of eliciting a confession from Joseph Stacy unless Michael Walter agreed to speak with Mr. Stacy first. Mitchell was forced on-the-spot to make a decision whether to allow this meeting to occur and potentially gain a confession (or alternatively be forced to break up a fist-fight), or disallow it and likely not gain a confession (and potentially hamper Stacy's prosecution). Although this is a difficult

---

[8] *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002), attempted to articulate the governing legal standard conceived by *Miller* as requiring that "the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result [to the plaintiff as a result of defendants' actions]". It is noteworthy, however, that *Ziccardi* was not a state-created danger case.

situation, it is not the type of hyperpressurized situation that is akin to a high-speed car chase, and therefore intent-to-harm is not the appropriate standard.  And although the plan to lure Joseph Stacy to the Walter home had already been discussed by Defendants, Mitchell did not have the luxury of relaxed thought in which to make a decision on whether to allow the discussion between Walter and Stacy, and therefore willful disregard or deliberate indifference to Michael Walter's safety is also not the appropriate culpability standard in this case.

Defendants incorrectly analogize *Lewis*, 523 U.S. 833, with the present case in arguing the proper culpability standard with which to consider Defendant Mitchell's actions on the day of Stacy's arrest.  *Lewis* involved a passenger on a motorcycle who was struck and killed by a police officer's patrol car after the motorcycle tipped over following a high-speed chase involving the vehicle.  The *Lewis* court stated: "[i]n the circumstances of a high-speed chase aimed at apprehending a suspected offender, where unforeseen circumstances demand an instant judgment on the part of an officer who feels the pull of competing obligations, only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the shocks-the-conscience test."  *Id.* at 834.  The situation facing Chief Mitchell in the present action could not fairly be considered this sort of hyperpressurized environment in which only an intent to cause harm would suffice the shocks-the-conscience test.

Contrarily, Plaintiffs analogize the present action to the *Smith* case in their omnibus brief.  (Doc. 80 pp. 24-27.)  *Smith* involved a Vietnam veteran who suffered from post-traumatic stress disorder.  He fled his home–without his heart medication–when

18

police arrived with a helicopter in order to arrest him, breaking windows and utilizing bright lights and tear-gas.  Police then created a perimeter around Smith's home and would not allow him to return.  Smith soon after suffered a fatal heart attack in the woods near his home as a result of the stress of the incident.

On appeal, the Third Circuit Court of Appeals held that the Estate of Smith had produced evidence sufficient to allow a reasonable jury to conclude that the officers' conduct both with regard to calling in the swat-team and with regard to their search of the woods–which involved searching only a few feet into the brush around Smith's home, while his body was only a couple hundred yards away where it decomposed for some time before being found by a neighbor–was conscience-shocking.  Importantly, the Smiths proffered the expert opinion of a doctor who suggested that the officers' conduct fell significantly below accepted professional standards for dealing with emotionally disturbed individuals.  *Smith*, 318 F.3d at 509.  Further, the *Smith* court held that the actions of the officers (i.e., surrounding the area around the home) cut Smith off from private sources of potential aid, in particular a neighbor who wanted to search the woods for Smith.  We find the facts of *Smith* to be distinguishable from the case *sub judice*.  This case does not deal with the situation, such as in *Smith* or *Kneipp*[9], where the plaintiff was of a peculiar mental, physical, or emotional state.

However, the actions of the Defendants may have "intervened to cut off [the

---

[9] *Kneipp* involved a situation where a police officer stopped a visibly intoxicated husband and wife for allegedly causing a disturbance.  When the officer allowed the husband to go home to relieve the babysitter watching his son, the husband assumed that the police would take the wife, whose blood alcohol level later was estimated at .25%, either to the hospital or to the police station.  The officer, however, eventually sent the wife home alone, and she was found later that night unconscious at the bottom of an enbankment near the Kneipps' home.  As a result of her exposure to the cold, she suffered hypothermia which led to permanent brain damage.  *See Kneipp*, 95 F.3d at 1201-02.

plaintiff's] private source of protection." *Kneipp*, 95 F.3d at 1210.  Defendants were aware of Joseph Stacy's history of violence, including the 1961 manslaughter conviction for shooting his then-girlfriend and the 1990 assault charge against him for pointing a gun at a person.  Defendants also knew that Mr. Stacy possessed an arsenal of weapons, and were aware of the comments he had made in the past about potentially shooting members of the Westfall Township Planning Board.  Knowledge of these facts, coupled with Joseph Stacy's actions in the short period of time leading up to the murder of Michael Walter, painted a clear profile to Defendants of a violent individual whose volatility was increasing.  Defendants' failure to notify the Walters of Mr. Stacy's state of mind in the week leading up to his sexual assault trial may have intervened to prevent Michael Walter from protecting himself in that he likely would have fled upon seeing Joseph Stacy at his place of business on July 5, 2002 had he known of the actions taken by Mr. Stacy earlier in that week.

When considering Defendants' failure to warn the Walters of the increasingly threatening behavior of Joseph Stacy in the period leading up to his trial for the alleged sexual assaults, the Court applies the 'deliberate indifference' culpability standard.  Since there was certainly time and opportunity for Defendants to take measures to protect themselves from Joseph Stacy, including the 'sting' operation planned by Timothy Mitchell for the Tuesday before Michael Walter's murder, Defendants clearly had the "luxury of relaxed deliberations" on how to protect themselves from the threat imposed by Joseph Stacy.  *Smith,* 318 F.3d at 508.  Certainly, then, it seems reasonable that a genuine issue of material fact exists as to whether Defendants' failure to warn the Walter family of Joseph Stacy's menacing behavior constituted deliberate indifference to the

Walters' safety, and could therefore be considered 'conscience-shocking' action.

Accordingly, Defendants have failed to satisfy their burden of proving that there is no

genuine issue of material fact as it relates to this second prong of the test.


C.     Existence of Relationship Between Victim and the State

The third element considers whether "there existed some relationship between the

state and the plaintiff."  *Morse*, 132 F.3d at 912.  This element "contemplates some

contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort

sense."  *Id.*  The plaintiff must be "a member of a discrete class of persons subjected to

the potential harm brought about by the state's actions," as opposed to a member of the

public in general.  *Id.* at 913.  The primary focus when making this determination is

foreseeability.  *Id.*  Defendants have failed to satisfy their burden of proving that there is

no genuine issue of material fact as it relates to this third prong of the analysis.

It is clear to the Court that there exists a genuine issue of material fact as to the

existence of such a relationship between the Walter family and the state actors in

question.  It is disputed whether Mr. Walter's participation in eliciting a confession from

Mr. Stacy was by his own choice or as part of some plan designed, or acquiesced to, by

the Defendants.  Defendants' conduct, even if tacit, creates a genuine issue of fact as to

the existence of a relationship between the parties, because Mr. Walter was certainly

made a foreseeable victim of Mr. Stacy's later conduct as a result of his involvement in

the confession.

Accordingly, the Court finds that Defendants have failed to satisfy their burden of

proving that there is no genuine issue of material fact as it relates to this third prong of

the analysis.

D.      *State Actor Using Their Authority to Create the Opportunity for Harm*

        The fourth and final prong of the state-created danger analysis inquires whether

the state actor affirmatively used his or her authority in a way that created a danger to the

citizen or rendered the citizen more vulnerable to danger than had the state not acted at

all.  This factor focuses on whether the state "has in some way placed the plaintiff in a

dangerous position that was foreseeable, and not whether the act was more

appropriately characterized as an affirmative act or omission."  *Id.* at 914.  The Court

finds that Defendants have also failed to satisfy their burden of proving that there is no

genuine issue of material fact as it relates to this fourth prong of the analysis.

        The Court is of the opinion that the present case represents one of those factual

scenarios in which "intermingling of state conduct with private violence" may satisfy the

fourth prong of the state-created danger analysis.  *Id.* at 915.  The *Morse* court observed

that this prong may be satisfied when the state actor places someone in a "unique

confrontational encounter" with a dangerous third party.  *Id.*  That phrase is meant to

apply, however, to situations that represent imminent harm to a victim, *i.e.*, placing a

prisoner on a work crew with individuals who are known to want to kill the prisoner.

Still, the Court feels that the Defendants have failed to satisfy their burden of showing

that no genuine issue of fact exists as to this prong of the analysis in that a reasonable

jury could find that the state's actions made Plaintiffs more vulnerable to harm than had

the state not acted at all.  By allowing Michael Walter to become involved in eliciting a

confession from Joseph Stacy, Defendants may have placed the Walters in a

22

foreseeable, dangerous situation that would not have otherwise existed.  Accordingly, the Court finds that Defendants have failed to satisfy their burden of proving that there is no genuine issue of material fact as it relates to the final prong of the analysis.

For the above stated reasons, the Court finds that the Defendants have failed to satisfy their burden of showing that no genuine issue of fact exists as to any of the four prongs of the state-created danger test.  Accordingly, Defendants' motion for summary judgment on Plaintiffs' substantive due process claim will be denied.

## II. Procedural Due Process

Plaintiffs' second cause of action is based upon a violation of procedural due process.  Plaintiffs allege that Mr. Walter had a property interest in police protection based upon either a state statute and bail release order or under existing Pennsylvania common law.  The United States Supreme Court has held that property interests created by state law are protected by the Due Process Clause of the Fourteenth Amendment. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).  The Court said "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577.  The Court added that "[p]roperty interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*  Therefore,

23

Pennsylvania law determines whether a property right exists in this case.

Plaintiffs allege that they had a property interest in police protection pursuant to 18 Pa. C.S.A. §§ 4952 ("Intimidation of witnesses or victims") & 4953 ("Retaliation against witness or victim") coupled with the issued bail release order, and cite the case of *Coffman v. Wilson Police Dep't*, 739 F.Supp. 257 (E.D. Pa. 1990) as support.  In light of the U.S. Supreme Court's decision in *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 125 S.Ct. 2796 (2005), and this Court's holding in *Starr v. Price*, 385 F.Supp.2d 502, 509 (M.D. Pa. 2005), however, we find that *Coffman* is not an accurate statement of the law.[10]

Plaintiffs argue in their First Amended Complaint that by obtaining the bail release order with its attendant conditions, the Defendants secured for Plaintiffs the right to receive police protection from Joseph Stacy.  (Doc. 6 ¶ 114.)  However, this Court can not find a sense in which the terms of the bail release order in this case could be considered more mandatory than the terms of the restraining order at issue in *Castle Rock*.[11]  In *Castle Rock*, as here, "[t]he simple distinction between government action that directly affects a citizen's legal rights . . . and action that is directed against a third party and affects the citizen only . . . incidentally, provides a sufficient answer to cases finding

---

[10] The mandatory language ("shall enforce" or "shall arrest") in the restraining order at issue in *Castle Rock* was held to be insufficient to create an entitlement protected by the Due Process Clause because of the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands."  *Starr*, 385 F.Supp.2d at 510 (quoting *Castle Rock*, 125 S.Ct. at 2806).

[11] *Castle Rock* involved the situation where a woman brought suit, claiming that she had a protected property right in police enforcement of a restraining order, issued pursuant to state law against her husband (who later killed their three daughters).  The Supreme Court held that no such property right existed under the Due Process Clause because enforcement of the restraining order was an indirect benefit to the plaintiff therein.

government-provided services to be entitlements." *Castle Rock*, 125 S.Ct. at 2810 (internal quotations and citation omitted).  The benefit to Plaintiffs of having Joseph Stacy kept in custody awaiting trial was an indirect or incidental one in that the action–or lack thereof–was directed against a third party (Stacy) and not the Plaintiffs themselves.  The Court concludes, therefore, that Plaintiffs did not, for purposes of the Due Process Clause, have a property interest in police protection due to the issuance of the bail release order.

Accordingly, Defendants' motions for summary judgment as to Plaintiffs' procedural due process claim will be granted.

### III. *Monell* Liability

Defendants Westfall Township, Pike County, and the Pike County District Attorney's Office have moved for summary judgment on the basis that Plaintiffs have failed to establish municipal liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  For the reasons set forth below, these motions will be granted.

The Court notes that in *Reitz*, 125 F.3d at 144, the Third Circuit Court of Appeals addressed the issue of whether a county district attorney's office is a separate legal entity for purposes of Section 1983.  In Reitz, the Third Circuit recognized that Pennsylvania law extends to counties the legal capacity to sue or be sued, but affirmed the District Court's finding that the Bucks County District Attorney's Office is not a legal entity for purposes of § 1983 liability.  *Id*. at 148.  *See also* Briggs v. Moore, 2005 U.S. Dist. LEXIS

18593, *12 (D.N.J.2005) ("A county district attorney's office is not a government entity

which can be sued under § 1983 separate from the individual who is the county

prosecutor or the governmental entity that the county prosecutor serves") (citation

omitted).

Hence, Defendant Pike County District Attorney's office may not be sued separate

and apart from Defendant District Attorney Douglas Jacobs or Pike County itself.  Finding

herein that Pike County is entitled to the defense of municipal immunity pursuant to the

*Monell* holding, applicable claims against the County or District Attorney's Office will be

maintained against Defendant Jacobs.

Proof of a single incident by a municipal employee does not suffice to establish

that an official policy or custom caused the constitutional violation, but a single incident

may in certain circumstances be sufficient to show a failure to train officials.  *See City of*

*Oklahoma City v. Tuttle*, 471 U.S 808, 813 (1985) (holding that a single, unusually

excessive use of force may be sufficiently out of the ordinary to warrant an inference that

it was attributable to inadequate training or supervision amounting to 'deliberate

indifference' or 'gross negligence' on the part of the officials in charge.)

Under *Monell*, a municipality cannot be held liable on the basis of *respondeat*

*superior*.  *See Monell*, 436 U.S. at 691.  A municipality can only be held liable where

there is evidence showing that the alleged constitutional violation was a result of

municipal policy, practice, or custom.  Stated differently, in order for a municipality to be

liable, its policies, practices, or customs must have been the "moving force" behind the

violation.  *See id.* at 694 (holding that a local government may not be sued under Section

1983 for an injury inflicted solely by its employees or agents.)  A "direct causal link between a municipal policy or custom and the alleged constitutional deprivation" must be established.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

"Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (internal citations and alterations omitted), *cert. denied*, 531 U.S. 1145 (2001).  "Customs are practices of state officials so permanent and well settled as to virtually constitute law."  *Id.* (internal citations and alterations omitted).  A custom may be demonstrated by showing that a practice is so well-settled and widespread that the policymaking officials had actual or constructive knowledge of it.  *Id.* at 276 (internal citations omitted).

Since Plaintiffs have failed to identify a municipal policy or custom that resulted in the alleged constitutional violation, this Court need not make a determination whether Defendants Mitchell, Jacobs, and DeSarro would qualify as "decisionmaker[s] possessing final authority to establish municipal policy".  *Berg*, 219 F.3d at 275.  Since we determine that the alleged constitutional violation was not a result of a municipal policy, custom, or practice, *Monell* liability can not adhere in this regard.  The Court will now consider whether *Monell* liability may apply to these municipalities for a failure to adequately train their employees.

A municipality's failure to train its employees can only be considered an actionable municipal policy, and therefore able to support a Section 1983 violation, when the failure to train, supervise, or discipline its employees evidences a deliberate or conscious

indifference to citizens' constitutional rights.  *Harris*, 489 U.S. at 389.  Additionally, the

United States Supreme Court has held that failure to adequately screen or train municipal

employees can ordinarily be considered 'deliberate indifference' only where the failure

has caused a pattern of violations.  *See Bd. of County Comm'rs of Bryan County, Okla. v.*

*Brown*, 520 U.S. 397, 408-09 (1997).  The *Bryan County* Court made clear that the

burden on a plaintiff to show failure-to-train without demonstrating a pattern of violations

is high.  The *Bryan County* Court went on to say that the Supreme Court in *Harris*:

> [L]eft open the possibility that a plaintiff might succeed in carrying a failure-
> to-train claim without showing a pattern of violations, wherein a narrow set
> of circumstances, a violation of federal rights may be a highly predictable
> consequence of a failure to equip law enforcement officers with specific
> tools to handle recurring situations.  The likelihood that the situation will
> recur and the predictability that an officer lacking specific tools to handle
> that situation will violate citizens' rights could justify a finding that
> policymakers' decision not to train the officer reflected "deliberate
> indifference" to the obvious consequence of the policymakers' choice.

*Id.* at 409.

Plaintiffs have failed to allege any pattern of constitutional violations of this type by

Defendants.  Furthermore, the Court does not find that this is one of those rare instances

in which the risk for harm to the public was so obvious that the decision of a municipality

not to train its employees to handle recurring situations presented an obvious potential for

such a violation to occur that may trigger municipal liability.

Accordingly, Defendants Westfall Township, Pike County, and the Pike County

District Attorney's Office are entitled to assert the defense of municipal immunity

pursuant to *Monell*, and these parties motions' for summary judgment will be granted.

28

**Defendants' Affirmative Defenses**

**I. Absolute Immunity**

Defendants DeSarro and Jacobs assert an absolute immunity defense for their roles in the present case.  Absolute immunity protects prosecutors in their quasi-judicial roles as advocates for the government.  *See Kalina v. Fletcher*, 522 U.S. 118, 124 (1997).  In determining if absolute immunity exists, the court's inquiry centers on the nature of the function performed, and not the identity of the actor who performed it.  *Id.* at 127.  A prosecutor is absolutely immune from suit while acting as an advocate in judicial proceedings.  *Id.* at 125.  However, "a prosecutor acting in an investigative or administrative capacity is protected only by qualified immunity."  *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999) (internal citations omitted).  In *Giuffre v. Bissell*, 31 F.3d 1241 (1994), the Third Circuit Court of Appeals followed the United States Supreme Court's holding in *Burns v. Reed*, 500 U.S. 478 (1991), holding that a prosecutor is not absolutely immunized for advice given to police during the investigative stages of a criminal proceeding.  The *Burns* Court expressly rejected the argument that a prosecutor's directory role in police investigations is sufficiently related to her advocate function.  The Supreme Court explained that "[a]lmost any action by a prosecutor ... could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive."  *Carter*, 181 F.3d at 356, n.58 (quoting *Burns*, 500 U.S. at 495).  Thus, the *Burns* holding expressly rejected the argument that a prosecutor's directory role in police investigations is sufficiently related to her advocate function.  This Court is also guided by the decision of the Third Circuit Court

29

of Appeals in *Mancini v. Lester*, which held:

> To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decisionmaking and the potential for needless actions. We believe that the right to make the decision without being subject to suit must include some limited right to gather necessary information. At the same time, we are sensitive to the possibility that this narrow exception could be distorted to include all of the prosecutor's investigative activities. We hold *only that to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution*, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself.

630 F.2d 990, 993 (1980) (emphasis added).

In the present case, it is undisputed that criminal charges would have been filed against Joseph Stacy, even if the prosecution had failed to elicit a confession from him. With that fact–and the precedent binding to this Court–in mind, the Court concludes that the involvement by the Pike County District Attorney's Office in the events that transpired at the Walter home on August 16, 2001 are properly categorized as investigative, and hence are not prosecutorial in nature.  Accordingly, the defense of absolute immunity will not apply to Defendants DeSarro and Jacobs for these investigative actions, and this affirmative defense will fail.  These investigatorial functions are more properly analyzed under the affirmative defense of qualified immunity, which is discussed below.

## II. Qualified Immunity

Because the Court has determined that Defendants DeSarro and Jacobs are not entitled to absolute immunity for their investigatory activities in this case, we will now consider their affirmative defense to qualified immunity for their decisions taken with

respect to the elicitation of a confession from Joseph Stacy.  The Court will also

determine if Defendant Mitchell is entitled to qualified immunity for his role in the

confession.  Further, the Court will separately consider if said Defendants are entitled to

qualified immunity for their individual failures to warn the Mitchell family as to the

increasingly threatening behavior of Joseph Stacy in the period leading up to his sexual

assault trial.

The initial inquiry in a qualified immunity analysis is whether the allegations made

by the party asserting them show that the state actor's conduct violated a constitutional

right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (citing *Siegert v. Gilley*, 500 U.S. 226,

232 (1991)).  If a violation can be made out on a favorable view of the parties'

submissions, a court must then determine whether that right was clearly established at

the time of the injury.  *Saucier*, 533 U.S. at 201.  "[G]overnment officials performing

discretionary functions generally are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982).

In this motion for summary judgment, it is in the Court's discretion to determine,

not only the applicable law, but whether that law was clearly established at the time an

action occurred.  If the law at that time was not clearly established, an official could not

reasonably be expected to anticipate subsequent legal developments, nor could he fairly

be said to "know" that the law forbade conduct not previously identified as unlawful.  If the

law was clearly established, the qualified immunity defense ordinarily should fail, since a

reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. *Id.* at 818-19.  In order to survive a motion for summary judgment predicated on a qualified immunity defense, a plaintiff must show that "the contours of the right [allegedly violated] [were] sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right."  *Smith*, 318 F.3d at 510-11 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

With the above principles as guidance, the Court finds that Defendants DeSarro and Jacobs are not entitled to a qualified immunity defense as to their investigatory acts in this case, *i.e.*, their involvement in the confession of Joseph Stacy.  However, Defendants DeSarro and Jacobs are entitled to assert the qualified immunity defense for their failure to warn the Walters of the threat posed by Joseph Stacy in the period leading up to his sexual assault trial.  Defendant Mitchell, however, is not entitled to the qualified immunity defense for his involvement at either stage of the case.

Because the Court holds in this memorandum that Defendants have failed to satisfy their burden of showing that there are no genuine issues of fact as to any of the elements of the state-created danger theory, a cognizable claim for violation of a constitutional right has been made by Plaintiffs.  In so finding, the Court must then determine if this right was clearly established at the time of the injury alleged.  The Court holds that this right did exist at all times relevant to this action.  *See, e.g., Smith*, 318 F.3d at 510 (finding that the state-created danger doctrine was clearly established by the year

1999).

Further, the Court finds that there is no genuine issue of material fact as to whether "in the light of pre-existing law the unlawfulness [of Defendants' acts] [was] apparent [to a reasonable official similarly situated]." *Anderson v. Creighton*, 483 U.S. at 640. This case represents a unique set of facts for analysis under the state-created danger doctrine. Even with that finding in mind, the state-created danger exception was well-enough established in the year 2001 such that the actions taken by Defendants were a violation of that constitutional right that should have been apparent to reasonable officials similarly situated to Defendants.

As to the elicitation of the confession from Joseph Stacy–in light of the then-existing law with respect to the state-created danger doctrine, and applying an objective standard–the unlawfulness of their actions should have been apparent to reasonable officials in the position of Defendants. As to the failure to warn Michael Walter of the potential threat posed by Joseph Stacy in the period leading up to his sexual assault trial, Timothy Mitchell–being Mr. Stacy's originally-intended target (as the events of the week of the murder suggest), and the lead officer on the case–was in the best possible position to know of the increasing danger, and thus it should have been apparent that it was unlawful for him to fail to forward a warning to the Walter family. Defendants Jacobs and DeSarro, however, were not active law-enforcement personnel attached to the case and were not in a position to directly know about the increasing threat from Mr. Stacy, and therefore their individual failures to warn the Walter family do not represent apparent constitutional violations of which reasonable officials in their positions should have been

aware.

Accordingly, Defendant Timothy Mitchell's assertion of the defense of qualified immunity will be rejected accordingly as to his involvement in both the confession and the failure to warn the Walter family.  Defendants DeSarro and Jacobs, however, are entitled to the qualified immunity defense only as to their failure to warn the Walter family of the danger posed by Joseph Stacy in the period of time leading up to Michael Walter's murder.  These Defendants will be maintained as named defendants in this action subject to the above-stated limitation on their potential liability.

**CONCLUSION**

After reviewing all pertinent evidence from the record, the Court is of the opinion that genuine issues of material fact exist as to some of the issues present in this case. Summary judgment pursuant to Federal Rule of Civil Procedure 56(c) will be granted in part and denied in part.

An appropriate Order will follow.

Date: November  29 , 2006                    /s/ A. Richard Caputo
                                             A. Richard Caputo
                                             United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SUSAN L. WALTER, et al.,

       Plaintiffs,

            v.

PIKE COUNTY, PENNSYLVANIA, and
the PIKE COUNTY DISTRICT
ATTORNEY'S OFFICE, et al.,

       Defendants.

NO. 3:03-CV-1690

(JUDGE CAPUTO)

<u>**ORDER**</u>

**NOW**, this __29th__ day of November, 2006, **IT IS HEREBY ORDERED** that:

1.    Defendants Timothy Mitchell, Douglas J. Jacobs, and Bruce DeSarro's motion for summary judgment under Federal Rule of Civil Procedure 56 is **GRANTED IN PART** and **DENIED IN PART** as follows:

       (a)  Defendants Timothy Mitchell, Douglas J. Jacobs, and Bruce DeSarro's motion for summary judgment as to Plaintiffs' procedural due process claim (Count II) is **GRANTED**;

       (b)  Defendants Timothy Mitchell, Douglas J. Jacobs, and Bruce DeSarro's motion for summary judgment as to Plaintiffs' substantive due process claim (Count I) is **DENIED**;

       (c)  Defendant Timothy Mitchell's motion for summary judgment on the issue of qualified immunity is **DENIED**;

       (d) Defendants Douglas J. Jacobs and Bruce DeSarro's motion for summary judgment on the issue of absolute immunity is **DENIED**;

       (e) Defendants Douglas J. Jacobs and Bruce DeSarro's motion for summary judgment on the issue of qualified immunity is:

              (i)  **GRANTED** as to their failure to warn the Walter family of the threat posed by Joseph Stacy in the period leading up to the murder of Michael Walter; and

(ii) **DENIED** as to their involvement in the elicitation of the confession from Joseph Stacy on August 16, 2001.

2.  Defendants Westfall Township, Pike County, Pennsylvania, and Pike County District Attorney's Office's motion for summary judgment under Federal Rule of Civil Procedure 56 is **GRANTED**.


 /s/ A. Richard Caputo

A. Richard Caputo
United States District Judge